# EXHIBIT C

**NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.**

| | | |
|---|---|---|
| STAMFORD HOLDING COMPANY, a Delaware business corporation ("Stamford") )<br><br>Claimant, )<br>v. )<br><br>MERRILL, LYNCH, PIERCE, FENNER & SMITH INC. ("Merrill Lynch"), )<br><br>Respondent. ) | | **NASD CASE NO. 03-06876** |

STAMFORD HOLDING COMPANY,
a Delaware business corporation ("Stamford")    )
                                                )
                                                )
                                    Claimant,   )
v.                                              )        **NASD CASE NO. 03-06876**
                                                )
MERRILL, LYNCH, PIERCE, FENNER                  )
& SMITH INC. ("Merrill Lynch"),                 )
                                                )
                                    Respondent. )
                                                )

### RESPONDENT MERRILL LYNCH'S
### PREHEARING BRIEF AND MOTION TO DISMISS

The Statement of Claim filed by Stamford Holding Company d/b/a Stamford Holding Corp. ("Stamford") is an outrageous work of fiction. Not only are the allegations contained in the Statement of Claim patently false, but they must have been know by Stamford and its counsel to be false when the Statement of Claim was filed. A better example of bad faith and vexatious litigation is almost impossible to imagine.

The essential basis of each of Stamford's claims is the allegation that Merrill Lynch conspired with New England Equity and its two principals, Christopher Plummer and Maureen Clark, to deprive Stamford's sole shareholder, Dr. Edmund Massullo, of his assets, which had been deposited into two Merrill Lynch accounts. In particular, Stamford alleges that Ms. Clark falsely represented herself to be President of Stamford and thereafter, without authority to do so, opened and directed the activity in Stamford's Merrill Lynch accounts (funded by the Massullos). Stamford claims that the Merrill Lynch Financial Advisor handling its accounts, Daniel Adams, conspired with Ms. Clark and Mr. Plummer to defraud

Dr. Massullo by obtaining and converting the assets deposited in Stamford's accounts to their own use.

Obviously aware of the total lack of merit to its claims, Stamford resisted providing any discovery in this case for more than one year after filing the Statement of Claim. Indeed, it was only in the face of an order threatening dismissal of this case with prejudice that Stamford finally produced a handful of documents responsive to Merrill Lynch's discovery demands.   As a result of documents produced last week by non-parties Christopher Plummer and New England Equity, however, we now know that the documents produced by Stamford in response to this Panel's discovery orders comprised only a minuscule portion of the documents relevant to Stamford's claims.   Moreover, the relevant documents, now that they are available, prove beyond any doubt that the claims asserted herein are frivolous and must have been known by Stamford and its counsel to be frivolous when the Statement of Claim was filed.

For these reasons, as discussed in greater detail below, Merrill Lynch respectfully requests that the Panel dismiss this case in its entirety with prejudice, and that the Panel enter an award of sanctions against Stamford and its counsel for their conduct in filing such unfounded claims.

## PROCEDURAL HISTORY

On June 9, 2004, Merrill Lynch served Stamford with Respondents' First Request for Production of Documents and Information (the "Requests," Exhibit 1 hereto).   Six months later, Stamford had failed to produce a single document in response to the Requests. Accordingly, by letter submission dated December 6, 2004, Merrill Lynch filed a motion to compel.

During a prehearing conference held on December 13, 2004, the Panel ordered Stamford to produce all documents requested by Merrill Lynch by January 28, 2005, or submit a brief explaining its failure to do so. In blatant violation of the Panel's order – and despite ample time in which to comply – Stamford failed to produce a single document on or before the Panel's imposed deadline. Accordingly, by letter submission dated February 8, 2005, Merrill Lynch moved for an order dismissing the case. As Merrill Lynch noted in its submission, "Given the amount of time that Stamford has had in which to comply with its discovery obligations (Merrill Lynch served the document demands at issue in June 2004), Merrill Lynch respectfully submits that the sanction of dismissal is entirely appropriate. In the alternative, however, Merrill Lynch requests the imposition of a monetary sanction for Stamford's clearly deliberate refusal to comply with the Panel's order."

During a prehearing conference held on March 24, 2005, the Panel once again ordered Stamford to produce responsive documents. This time, the Panel expressly stated that it would dismiss the case with prejudice if Stamford failed to comply.

In response to that order, Stamford finally produced a handful of documents, two of which *alone* require dismissal of this case. More recently, however, Merrill Lynch has obtained more than 45 boxes of documents from non-parties Christopher Plummer and New England Equity which include *overwhelming* evidence that the case is based on false allegations necessarily known by Stamford and its counsel to have been false when made. Even worse (if that is possible), the documents produced by Mr. Plummer and New England Equity were exchanged with Edmund Massullo (Stamford's sole shareholder) years ago in connection with an arbitration addressing virtually identical claims by the Massullos in February 2000 (the "Connecticut Arbitration"). Indeed, among the documents contained in

the 45 boxes delivered to Merrill Lynch last week are copies of the Massullos' and New England Equity's exhibit binders from the Connecticut Arbitration – binders containing irrefutable proof that:   (1) Maureen Clark had actual authority to disburse funds from Stamford's Merrill Lynch accounts, (2) the disbursements made from Stamford's accounts were made to the Massullos and to their known creditors, and (3) even Stamford's counsel in *this* proceeding, Rudolph J. Di Massa, Esq., understood that Ms. Clark had check-writing authority on behalf of the Massullos because he twice asked Ms. Clark to write checks to pay for certain expenses in connection with a lawsuit he was handling for them (which she did).

Given the overwhelming evidence, discussed in detail below (and included in the accompanying Exhibit Book), that Stamford's Merrill Lynch accounts were well-diversified and *profitable*[1], that Maureen Clark had actual (and certainly apparent) authority to disburse funds from those accounts, and that the disbursements made from Stamford's accounts were made either to the Massullos or to their known creditors, there would be no purpose served by an evidentiary hearing in this case.   There is no issue of fact requiring trial, and the case should be dismissed with prejudice.

## I.    THE PANEL HAS THE POWER TO DISMISS THIS ACTION

The Tenth Circuit recently re-affirmed, on April 20, 2005, that an NASD arbitration panel may dismiss a Statement of Claim prior to any evidentiary hearing if the allegations presented in the Claim are without merit. *Vento v. Quick & Reilly, Inc.*, 2005 WL 906585 (10th Cir.(Colo.)), attached hereto at Tab A. *See also Sheldon v. Vermonty*, 269 F.3d 1202,

---

[1]    A profit and loss analysis of Stamford's accounts is included as Exhibit 36 hereto.

1206 (10th Cir. 2001) (holding that an NASD arbitration panel has full authority to grant, with prejudice, a pre-hearing motion to dismiss based only on the parties' pleadings); *In re Arbitration Between Intercarbon Bermuda, Ltd. and Caltex Trading and Transport Corp.*, 146 F.R.D. 64, 74 (S.D.N.Y. 1993) (upholding arbitrators' decision to dismiss without hearing, stating that "[h]earings will not be required just to see whether real issues surface.").

Here, a mass of documentary evidence eliminates the possibility of any credible issue of material fact that would require a trial of Stamford's claims, and the case should be dismissed in its entirety, with prejudice.

## II. MAUREEN CLARK HAD ACTUAL CHECK-WRITING AUTHORITY WITH RESPECT TO STAMFORD'S MERRILL LYNCH ACCOUNTS, AND THE MASSULLOS (AND THEIR COUNSEL) KNEW THAT SHE WAS USING THAT AUTHORITY

On or about August 1, 1993, Ann Marie Massullo and Mystic Investment Corporation ("Mystic") entered into an Operations Consulting Agreement with New England Equity. *See* Operations Consulting Agreement, dated August 1, 1993, Exhibit 2 hereto. Mrs. Massullo was the President and (with her family) owner of Mystic, which in turn owned a real estate development located in Groton, Connecticut. The Mystic property was operating at a deficit, and Mrs. Massullo engaged New England Equity and its principals, Christopher Plummer and Ms. Clark, to operate and manage the property in an effort to convert it to profitable use and/or restructure its debt, which at the time exceeded the appraised value of the property. Ms. Clark was an experienced real estate developer, and she and Mr. Plummer had particular expertise in real estate and other workout transactions. Upon information and belief, the Massullos had been referred to Ms. Clark and Mr. Plummer by a prominent local attorney.

On October 18, 1993, Mrs. Massullo and her husband, Edmund Massullo, entered into a second agreement with New England Equity pursuant to which New England Equity (through Ms. Clark and Mr. Plummer) were to evaluate, restructure and ultimately resolve all the Massullos' significant outstanding personal and corporate liabilities (not simply those relating to the Mystic property), which at the time exceeded $12 million. *See* Agreement, dated October 18, 1993, Exhibit 3 hereto. As part of their responsibilities under this new Agreement, Ms. Clark and Mr. Plummer were to "review, evaluate, advise and direct [the Massullos] regarding the status of litigation, Judgments, and suits and [to] supervise retained counsel as deemed necessary for the best interest of [the Massullos]." *Id.* at ¶ 3(c). Ms. Clark and Mr. Plummer were also charged with responsibility for representing the Massullos' "position in all meetings, including but not limited to bank, partnership, legal, accountant, acquisition and sales for the disposition of [the Massullos'] property real or personal." *Id.* at ¶ 3(d). They were further responsible for providing advice "regarding all financial situations, investments and ventures of [the Massullos]." *Id.* at ¶ 3(e).

### A.    The Massullos' Grant of a General Power of Attorney to Ms. Clark, and Their Acknowledgement to Third Parties of Her Power to Act for Them

On November 2, 1993, to facilitate Ms. Clark's and Mr. Plummer's performance of their responsibilities under the October 1993 Agreement, the Massullos executed a General Power of Attorney pursuant to which they appointed Ms. Clark to be their attorney-in-fact. *See* General Power of Attorney, dated November 2, 1993, Exhibit 4 hereto. Mrs. Massullo acknowledged having granted a general power of attorney to Ms. Clark during testimony in another matter:

Q:    You mentioned there were various contracts which explain the relationship, your professional relationship with these people [Maureen Clark and Christopher Plummer].

A:    Uh-huh.

Q:    Would that include in connection with these entities?

A:    It would be New England Equity.

Q:    *Is there any power of attorney that you've executed on their behalf or in favor of them?*

A:    *Yes.*

Transcript Excerpt from the Deposition of Anne Marie Massullo, June 17, 1996, Exhibit 5 hereto, at 26-27 (emphasis added).

During that same deposition (in a case for nonpayment of legal fees), Mrs. Massullo confirmed the broad scope of Ms. Clark's and Mr. Plummer's activities on her behalf:

Q:    How many things are Maureen Clark and Christopher Plummer involved in as far as doing work for you, negotiating things?

A:    They take care of my business.

Q:    Could you quantify your business?

A:    They are taking care of the banks. They're negotiating with the – they do all of the work for the banks, all of the existing liens. This is their work.

Q:    What's the extent of the loans that you're involved with?

A:    Quite large.

Q:    Give me a number.

A:    Millions.

Q:    How many millions?

A:    Many millions.

Q:    How many "many"?

A:    I know it's – there are many many liens, along with yours.

Q:    On what?

A:    On everything we own.

*    *    *

Q:      . . . [I]n retaining Maureen Clark and Christopher Plummer, you signed the contracts with them, right?

A:      Yes.

Q:      And you reviewed them before you signed them; isn't that correct?

A:      Absolutely.

Q:      And you understand them?

A:      Yes.

*Id.* at 49-50.

The Massullos also confirmed in writing to certain of the their creditors, including Bank One, that Ms. Clark had the power to act on their behalf.  Thus, for example, the Massullos each signed an authorization letter, dated June 1, 1996, in which they confirmed to Bank One that "Maureen Clark has the authorization of Dr. Massullo and Anne Marie Massullo to discuss and negotiate on behalf of us our obligations to Bank One."  Letter from the Massullos to Jeff Nicolson, dated June 1, 1996, Exhibit 6 hereto; *see also* Letter from Metropolitan Savings Bank to Maureen Clark, dated April 20, 1995, Exhibit 7 hereto ("This letter is being directed to you at the request of Anne Marie Massullo . . . . I have been told by Anne Marie Massullo that she has authorized your office to forward the requested material.").

**B.      Dr. Massullo Has *Admitted* Ms. Clark's Authority With Respect to Stamford's Accounts, and the Massullos Have Signed a Release and Indemnification Agreement Specifically Referring to Ms. Clark's Actions as "Sole Signatory" for Stamford's Accounts**

Stamford Holding Company was incorporated (with no involvement whatsoever from Merrill Lynch or its Financial Advisor, Daniel Adams) on or about July 18, 1995. Thereafter, by his sworn admission, Dr. Massullo, Stamford's sole shareholder, appointed

Ms. Clark to act as President/Secretary and Mr. Plummer to act as Vice-President of Stamford. In 2002, Dr. Massullo expressly stated, under penalty of perjury:

> On July 18, 1995, the Massullo Financial Group formed the Plaintiff [*i.e.* Stamford] Delaware corporation **with Massullo as the sole 100% shareholder, Clark as president/secretary and Plummer as vice-president.** On August 8, 1995, the Massullo Financial Group opened two accounts with Defendant Merrill Lynch in the name of Stamford Holding Company and funded the same as per P&L, marked Exhibit "A" to the Complaint and attached hereto as Exhibit "A."

Affidavit of Edmund A. Massullo, dated March 1, 2002, Exhibit 8 hereto, at p. 2 (emphasis added).

On or about August 8, 1995, Ms. Clark opened the two Stamford accounts at issue in this proceeding in her capacity as President of Stamford. The purpose of the accounts was to collect and invest the proceeds from the sale of certain of the Massullos' properties in an account where they could (hopefully) appreciate while Ms. Clark and Mr. Plummer negotiated with Bank One and other creditors to pay off the Massullos' outstanding debts. The Massullos and Ms. Clark also specifically agreed that the assets deposited in Stamford's accounts should be used to pay for the various professionals, including lawyers and accountants, involved in the effort to restructure the Massullos' debts and improve their financial situation.

Although Dr. Massullo now asserts – contrary to what he swore in his March 2002 affidavit – that Ms. Clark was ***not*** appointed President of Stamford, his about-face on this issue is as irrelevant as it is suspect. Even if Ms. Clark had never been an officer (let alone President) of Stamford, the record clearly reflects that she still had both the actual and apparent authority to write checks against Stamford's accounts – the only issue that matters for purposes of this proceeding.

Going directly to the heart of that issue is a General Release and Indemnification Agreement (the "Release," Exhibit 9 hereto) executed by the Massullos the day after Ms. Clark opened Stamford's Merrill Lynch accounts (bearing account nos. 880-06871 and 880-06872). In that Release, *the Massullos expressly acknowledged, in writing, Ms. Clark's check-signing authority with respect to Stamford's accounts*:

> [T]he undersigned hereby jointly and severally forever releases, discharges, acquits, indemnifies and forgives Maureen Clark from any and all claims, actions, suits, demands, agreements, liabilities and proceedings of every nature and description both at law and in equity arising from the beginning of time to the end of time and more particularly related to:
>
> Any and all actions by Maureen Clark *acting as Power of Attorney for Dr. Edmund A. Massullo and sole signatory for Stamford Holding Corp.* Further, for the payments of any and all bills, debts and obligations including New England Equity, Inc. of Dr. Massullo and or any family members or related entities of Dr. Massullo, *which shall be paid through the Stamford Account. . . .*

Release, dated August 9, 1995, Exhibit 9 hereto (emphasis added).

On August 25, 1995, Dr. Massullo entered into a separate agreement with his attorney, Ramona DeSalvo, which is signed by him and expressly states that if Dr. Massullo "wishes to utilize funds from the Stamford Holding Corporation account at Merrill Lynch," he cannot do so directly but "must forward a request to Ms. DeSalvo, who "will be responsible to forward an authorization to Merrill Lynch *for the funds to be withdrawn by Maureen Clark*." Stamford Agreement, Exhibit 10 hereto, p. 1 (emphasis added).

C.    **Judge Droney's Decision That Ms. Clark Had Both Actual and Apparent Authority Is the Law of the Case, and the Massullos Are Not Free to Dispute It**

Finally, Judge Christopher J. Droney of the District of Connecticut has already held that there is no credible evidence to support Stamford's claim that Ms. Clark was neither the

President of Stamford nor authorized to act on its behalf. In his order compelling this arbitration of Stamford's claims against Merrill Lynch, Judge Droney correctly held:

> **SHC's [i.e., Stamford's] denial [of Ms. Clark's authority] occurred only after Merrill Lynch sought to compel arbitration.** Dr. Massullo's claims that the agreements are void is completely lacking in his first affidavit filed in this case. Compare First Massullo Aff. (filed March 5, 2002) with Second Massullo Aff. Additionally, those allegations contradict the amended complaint filed by Dr. Massullo in the Ohio lawsuit, where Dr. Massullo alleged that Clark opened the accounts within her capacity as President and Secretary of SHC. Finally, **SHC has not created a genuine issue of material fact as to whether Clark's opening of the accounts with Merrill Lynch was an unauthorized act. Moreover, ... SHC has not created a genuine issue of material fact as to whether Merrill Lynch had any basis to conclude that Clark was unauthorized to execute the agreements and therefore lacked actual or apparent authority.** Accordingly, SHC has failed to establish a genuine issue of material fact as to the arbitrability of the account agreements, and arbitration must be ordered in accordance with the account agreements.

Order entered in *Stamford Holding Co. v. Maureen Clark et al.*, No. 3:02CV1236 (CFD) (the "Connecticut Action"), Exhibit 11 hereto, p. 16 (emphasis added). Judge Droney's opinion is binding on Stamford, and his holding concerning Ms. Clark's actual and apparent authority may not be re-litigated here.[2]

---

[2] It is well-settled that a party will be barred from re-litigating an issue decided in a prior proceeding where: (1) the party sought to be barred was a party (or in privity with a party) to the prior action; (2) there has been a final determination on the merits of the issue sought to be precluded; (3) the party against which preclusion is sought had a full and fair opportunity to litigate the issue in the prior proceeding; (4) the issue decided in the prior proceeding is the same issue sought to be precluded; and (5) the issue was material and necessary to the prior determination. *C.H. Sanders Co. v. BHAP Housing Dev. Fund Co.*, 903 F.2d 114, 121 (2d Cir. 1990); *Gelb v. Royal Blove Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986). It is irrelevant, for estoppel purposes, whether the issue on which preclusion is sought was decided by a jury verdict or by a court-rendered decision. *Combs v. Richardson*, 838 F.2d 112 (4th Cir. 1988); *In re Latch*, 820 F.2d 1163 (11th Cir. 1987).

Here, there is no question that: Stamford was a party to the Connecticut Action; the issue of Ms. Clark's authority to act on behalf of Stamford with respect to its Merrill Lynch account was raised on Merrill Lynch's motion to compel arbitration; Stamford had a full and fair opportunity to litigate the issue in the Connecticut Action; and the issue was material and necessary to Judge Droney's determination that Stamford could be compelled, on the basis of Ms. Clark's actions in signing two account agreements as the President of Stamford, to arbitrate any claims it might have against Merrill Lynch.

### D. There Is No Factual Issue Requiring a Trial to Determine Ms. Clark's Actual Authority to Direct the Transactions In Stamford's Accounts

Actual authority exists when "an agent has the power to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestation to him." *Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc.*, 241 F.Supp.2d 246, 260 (S.D.N.Y. 2002) (citations omitted). Here, there is compelling and abundant evidence of Dr. Massullo's manifestation to Ms. Clark of her authority to manage the monies deposited in Stamford's Merrill Lynch accounts. The General Power of Attorney and the General Release and Indemnification Agreement signed by the Massullos *by their plain language* gave Ms. Clark unfettered authority to act on Dr. Massullo's behalf, including through the exercise of his voting rights as Stamford's sole shareholder (had she chosen to do so).

As a result, Ms. Clark had actual authority to direct the transactions in Stamford's Merrill Lynch accounts, and Merrill Lynch cannot be held liable for its actions in following Ms. Clark's directions.

## II. MAUREEN CLARK HAD APPARENT AUTHORITY TO DISBURSE FUNDS FROM STAMFORD'S MERRILL LYNCH ACCOUNTS

Even assuming, *arguendo*, that Ms. Clark did not have actual authority with respect to the Merrill Lynch accounts (which she did), Merrill Lynch was nevertheless entitled to rely on her apparent authority to make decisions with respect to transactions in the accounts.

Apparent authority "arises from the written or spoken words or any other conduct of the principal, which, reasonably interpreted, causes a third person to believe that the principal consents to have an act done on his behalf by the person purporting to act for him." *Hidden Brook Air,* 241 F. Supp.2d at 261. The evidence here is more than sufficient to

establish Ms. Clark's apparent authority to act with respect to Stamford's Merrill Lynch accounts.

In addition to the facts establishing Ms. Clark's actual authority, there are further facts from which Ms. Clark reasonably appeared to Mr. Adams and Merrill Lynch to have the authority to manage and make decisions concerning Stamford's Merrill Lynch accounts. For example, although Dr. Massullo controlled his separate personal accounts at the firm, he never sought to direct or control the transactions in Stamford's accounts (which he clearly knew about since (a) he and his wife funded the accounts, including through the deposit of checks endorsed by them with a notion that they should be deposited into the Stamford Holding account (*see* Exhibit 36 hereto), (b) he and his wife signed the Release, which expressly referred to Ms. Clark's actions as "sole signatory for Stamford Holding Corp." (*see* Exhibit 9 hereto), (c) he and his wife signed the Stamford Agreement, which expressly referred to Stamford's Merrill Lynch accounts (*see* Exhibit 10 hereto), and (d) on several occasions, Dr. Massullo expressed his awareness of the accounts during discussions with Mr. Adams.

In fact, Dr. Massullo on various occasions told Mr. Adams explicitly that Ms. Clark was responsible for making decisions with respect to Stamford's accounts – just as the Massullos made this comment to a number of other professionals with whom they worked. *See, e.g.,* Points III (F) and (H), below.  Moreover, several checks drawn on Stamford's cash account by Ms. Clark were made payable *directly to Dr. Massullo and his wife*.  The remaining disbursements from the accounts were made to Dr. Massullo's known creditors. *See* Point III, below.

In short, Dr. Massullo's statements and conduct reasonably caused Mr. Adams and Merrill Lynch to believe that he consented (as sole shareholder of Stamford) to have Ms. Clark act on Stamford's behalf.

## III.   THE ALLEGATION THAT MR. ADAMS AND MS. CLARK CONVERTED STAMFORD'S ASSETS FOR THEIR OWN USE AND BENEFIT IS PATENTLY FALSE

One of the few documents provided by Stamford in discovery was an accounting of the deposits into and withdrawals from Stamford's Merrill Lynch accounts.   *See* Stamford Accounting, Exhibit 12 hereto.[3]  Having had limited opportunity to review the myriad documents produced by Mr. Plummer and New England Equity last week, Merrill Lynch is nevertheless already able to show (although it is not its burden to do so) that each of the disbursements from Stamford's accounts was made either to the Massullos directly or to their known creditors.  For Stamford to continue to claim, as it does, that its Merrill Lynch Financial Advisor, Dan Adams, conspired with Ms. Clark to perpetrate "a dastardly concert of action to defraud [Stamford] by obtaining and converting money *to their own use*" (Statement of Claim, ¶16) is entirely spurious and warrants an award of sanctions.

After reviewing 45 boxes filled with correspondence, invoices, pleadings, judgments, liens, agreements, loan files, and a host of other material relating to the Massullos – all of which were exchanged by the parties in the prior litigation between the Massullos and Ms. Clark, Mr. Plummer and New England Equity – Merrill Lynch has identified the following documents relating to the recipients of funds from the Stamford accounts:

---

[3]      Although Merrill Lynch disagrees with certain of the entries in the Massullos' accounting, we use it here for purposes of this motion to demonstrate that, even by the Massullos' reckoning, they cannot possibly meet their burden of demonstrating that Mr. Adams converted money for his own use and benefit.

### A.    Bank One ($350,000)

There are several boxes of documents relating to the Massullos' loan guaranty obligation to Bank One (concerning the Mystic property).  Essentially, as recited in a Forbearance and Settlement Agreement among Bank One and Massullos in June 1996 (the "Forbearance Agreement," a copy of which is Exhibit 13 hereto), the Massullos' company, Mystic, had executed a Business Purpose Promissory Note in the original principal amount of $2.6 million (the "Note").  To secure repayment of the Note, the Massullos had executed and delivered to Bank One (a) a personal Guaranty for Business Credit, dated February 19, 1992, (b) an Ohio Open End Mortgage, also dated February 19. 1992, which was recorded in the official records of Columbiana County, Ohio, and (c) an Assignment of Life Insurance Policy as Collateral, thereby assigning to Bank One all of Dr. Massullo's interest in his life insurance policy issued by Phoenix Mutual Life Insurance Company.  *Id.* at pp. 1-2.  Mystic defaulted on the Note, and Bank One notified the Massullos in April 1995 that their personal guaranties were also in default. *Id.* at p. 2.  Bank One thereafter, on April 7, 1995, obtained a judgment against the Massullos personally for the principal sum of $2,371,063 plus accrued but unpaid interest and certain other charges. *Id.*

After extensive negotiations with Ms. Clark and Mr. Plummer (acting on the Massullos' behalf), Bank One entered into the Forbearance Agreement, pursuant to which the bank agreed that, *in consideration for receiving a payment of $350,000 of principal amount due and owing on the Note*, and on certain other conditions, the bank would forbear from initiating proceedings to collect on its judgment against the Massullos.  Exhibit 13 at p. 4, ¶¶ 4, 12. *On the same day that the parties signed the Forbearance Agreement*, June 14, 1994, Ms. Clark authorized a wire transfer of $350,000 from Stamford's account for credit to an account at Bank One in the name

of "Mystic Investment Corp." for "Obligation #18." *See* Exhibit 14 hereto. As the relevant documents make clear, this payment was required as a condition of Bank One's agreement not to initiate proceedings to execute on its judgment against the Massullos personally.

Notably, Dr. Massullo himself later authorized the transfer of an additional $150,000 from his personal (*i.e.*, non-Stamford) account with respect to repayment of the loan – a wire transfer that was similarly, and at his instruction, credited to the same account at Bank One, in the name of "Mystic Investment Corp.," for "Obligation #18." *See* Exhibit 15 hereto. This payment, too, is compelling evidence that the wire transfer made from Stamford's Merrill Lynch account was made for the benefit of the Massullos – and certainly not for the benefit of Mr. Adams or Ms. Clark.

**B.    Duane Morris & Heckscher ($67,692)**

There are myriad documents relating to the legal services performed by Duane Morris & Heckscher ("Duane Morris") for the Massullos personally during the period that firm received payments drawn against Stamford's Merrill Lynch account. Notably, those services were provided by Rudolph J. Di Massa, Jr., the son of the Massullos' counsel of record in this proceeding.

Merrill Lynch has included in Exhibit 16 to this motion: (i) Duane Morris's engagement letter confirming the terms on which that firm would be representing the Massullos, (ii) Duane Morris's invoices to the Massullos, which were addressed to Dr. Massullo at his home address until February 1997, at which point they were addressed to Dr. Massullo "c/o Ms. Maureen Clark," and (iii) a billing and payment ledger prepared by Duane Morris, dated February 12, 1998, reflecting that ***Stamford's check nos. 154, 157, 173 and 180 were credited against the outstanding fees owed by the Massullos' personally to Duane Morris***. It seems

self-evident that if the Massullos' personal lawyers believed, based on his discussions with his clients, that Ms. Clark had the authority to disburse the funds necessary to pay the Massullos' bills, then she must in fact have had that authority.

Moreover, $35,848.47 of the monies disbursed from Stamford's Merrill Lynch account to Duane Morris coincides exactly with monies deposited by that firm with the Montgomery County Prothonotary as cash security to perfect an appeal taken by the Massullos from a judgment against them.   In November 1997, Mr. Di Massa, Jr., informed counsel for certain judgment creditors of the Massullos that the Massullos had posted cash security to perfect an appeal from the judgment against them, including by the deposit of $35,848.47 with the Montgomery County Prothonotary.  Significantly, the very same day that $35,848.47 was deposited on the Massullos' behalf with the Montgomery County Prothonotary, Stamford disbursed a check in the amount of $35,848.47 to Duane, Morris.  *See* Letter from Mr. Di Massa, Jr. to Michael Goldberg, Esq., enclosing the Prothonotary's receipt, attached as Exhibit 17; *see also* Exhibit 12 (reflecting the $35,848.47 check to Duane Morris).  These documents make it impossible for Stamford now to allege that its check to Duane Morris was used for some purpose other than to obtain the stay of execution referred to in Mr. Di Massa, Jr.'s letter.

### C.      Poplaski & Co. ($35,024)

There were five checks drawn on Stamford's account and payable to Poplaski & Co. during the period August 1996 through March 1998.  The documents and invoices included in Exhibit 18 to this motion establish that Poplaski & Co. was providing the Massullos at the time with a variety of personal accounting and tax services, including the preparation of the Massullos' personal income tax returns.  Moreover, the firm addressed its bills to the Massullos

"c/o Maureen Clark," reflecting its understanding that she was authorized to receive the bills and arrange for payment on the Massullos' behalf.

### D.    Simonson Lipshutz Fogel PC ($3,000)

The Massullos' accounting lists one check drawn on Stamford's account that was payable to Simonson, Lipschutz & Fogel.  Included in Exhibit 19 are two invoices reflecting that that firm acted as tax advisor for at least two of the Massullos' partnerships.  Also included is the firm's engagement letter, which was addressed to Dr. and Mrs. Massullo.  It defies credulity for the Massullos to suggest that, although Simonson Lipschutz provided tax advisory services to them, the monies paid to the firm from Stamford's accounts were not paid for their benefit, but rather for the personal benefit of their Mr. Adams and Ms. Clark.

### E.    Ramona Dittman, Esq. ($15,500)

Ramona Dittman n/k/a DeSalvo had an attorney-client relationship with the Massullos and Stamford.  Indeed, she has not produced documents in response to Merrill Lynch's discovery requests because Dr. Massullo has either refused or failed to waive the attorney-client privilege. *See* Letter from June Sullivan, Esq. to Lauren Gould, Esq., dated June 10, 2005, Exhibit 20 hereto.  Any claim that Stamford's payments to Ms. Dittman/DeSalvo were unrelated to the Massullos is simply untenable.

### F.    Steven Goldberg, Esq. ($6,641)

Counsel for Merrill Lynch were able to locate in the files produced by Mr. Plummer and New England Equity: (i) a partial copy of a retainer agreement between attorney Steven Goldberg and Mrs. Massullo, and (ii) three invoices from Mr. Goldberg to Mrs. Massullo, including a December 1996 invoice with a time entry (on 11-25-96) stating that Mrs. Massullo had called "*requesting that we deal directly with Maureen Clark for everything.*"  *See* Exhibit 21 hereto

(emphasis added).  The December 1996 invoice also includes reference to Mr. Goldberg's receipt of a $3,000 retainer check, corresponding to a check written against Stamford's account on December 30, 1996.  *See* Exhibit 21 hereto.  The "second request" invoice issued in July 1997 includes a handwritten notation, "pd. $1,500" – which corresponds with a check written against Stamford's account on July 31, 1997 in the amount of $1,500.  *Id.*  Again, it defies credulity for the Massullos to claim that these payments to Steven Goldberg were a strange coincidence and were not for their benefit but, rather, for the benefit of Mr. Adams or Ms. Clark.

**G.    Honigman Miller ($12,414)**

One check drawn on Stamford's account was made payable to Honigman Miller Schwartz & Cohn ("Honigman Miller"), the law firm that represented Dr. Massullo in a case filed by him against John Sexton & Co.  Included in Exhibit 22 are several invoices reflecting Honigman Miller's representation of Dr. Massullo in the *Sexton* case and its representation of the Massullos in connection with "Dr. and Mrs. Massullo's Bank One dispute."  *See* Letter to Mr. Plummer, dated October 8, 1996, included in Exhibit 22 hereto.  Notably, Mrs. Massullo is copied on the letter relating to the Sexton settlement, which is actually addressed to Mr. Plummer at New England Equity.  Moreover, a Honigman Miller facsimile message to Mr. Plummer, dated April 7, 1998, states that Mrs. Massullo had asked the firm to send Mr. Plummer a billing and payment history for the Massullo account.  *Id.*

From these facts, the only logical conclusion is that the check written to Honigman Miller was related to its representation of the Massullos.  It is pure fantasy to suggest that the check represented, instead, the conversion of funds by Ms. Clark and Mr. Adams for their personal benefit.

### H.    Charles Irving ($560,030)

The various payments made to Charles Irving, Esq., during the period August 1995 through December 1997 are supported by invoices included in Exhibit 23 hereto. Additionally, however, Mr. Irving's letters to the Massullos reflect a clear delegation of authority by the Massullos to Ms. Clark with regard to their business and legal affairs – including with respect to the payment of the invoices relating thereto.

Thus, for example, Mr. Irving wrote to the Massullos in May 1996:

> Attorney Merry's letter of May 10, 1996 constitutes an offer of settlement of this matter. I have already discussed this settlement proposal at length with Maureen Clark and I understand that she has discussed this with you as well and will continue to discuss this with you in the future. *I continue operating under the understanding that Maureen Clark has full authority to represent you in this matter and that you have instructed me to communicate primarily with her concerning all aspects of our representation of Mystic Investment Corporation and each of you individually. This process has appeared to have worked satisfactorily in the past and I will continue to do so, unless I have been instructed by you otherwise.*
>
> Please communicate your thoughts on this settlement proposal to Maureen so that she might be in a position to advise me how we should respond.

Letter from Mr. Irving to Mystic Investment Corp. c/o Edmund and Ann Marie Massullo, dated May 14, 1996, Exhibit 23 (emphasis added).

Mr. Irving similarly wrote to Ms. Clark in January 1997 about a discounted fee arrangement that he believed would:

> . . . better accommodate the budgetary constraints of the principals of Mystic Investment Corporation [the Massullos] and yet allow us to continue to vigorously pursue this litigation.
>
> Our records reflect a present outstanding balance due from Mystic Investment Corporation and its principals [the Massullos] in the amount of $65,250.16 as of January 1, 1997 . . . .
>
> This correspondence is being forwarded to you as business agent for Mystic Investment Corporation *and pursuant to previous instructions received from Dr.*

*Edmund Massullo and Anne Marie Massullo that all such correspondence should be directed to you on their behalf.* I look forward to continuing to work with you in this matter and anticipate receiving your response as soon as you have had an opportunity to discuss this with our mutual clients.

Letter from Mr. Irving to Ms. Clark, dated January 15, 1997, Exhibit 23 (emphasis added); *see also* Letter from Mr. Irving to Ms. Clark (with a copy to the Massullos), dated February 4, 1998 ("Please let me know what Doctor and Mrs. Massullo and Mystic Investment Corporation intend to do with reference to these invoices").

Once again, it is preposterous for the Massullos to claim, as they do, that monies paid to Mr. Irving were not paid for their benefit but rather reflect some scheme by which Mr. Adams, a Merrill Lynch Financial Advisor, sought to convert the Massullos' money to his own use (or to that of Ms. Clark).

### I.    Kahn Kleinman Yanowitz & Arnson Co. L.P.A. ($36,500)

As reflected in the documents included in Exhibit 24 hereto, Kahn Kleinman Yanowitz & Arnson ("Kahn Kleinman") represented the Massullos in the action resulting in Bank One's judgment against them on their personal guaranties of the Mystic Note. Kahn Kleinman's invoices more than support the payments made to that firm from Stamford's account. Moreover, Dorothea Polster's letter to Maureen Clark, dated May 9, 1996, *which was also copied to the Massullos*, refers specifically to the $17,000 payment made from Stamford's account (by check no. 120) and explains how the payment was applied.

### J.    Rudolph J. DiMassa, Leon LaRosa and Walter Weir ($3,000 total)

Incredibly, *even the Massullos' counsel of record in this proceeding* was instructed by his clients to contact Ms. Clark and Mr. Plummer about getting a check to pay the retainer required by two expert witnesses whom Mr. Di Massa wanted to hire in a case filed against the

Massullos by one of their former law firms, Hamburg, Rubin, Mullin, Maxwell & Lupin (the

"Lupin Lawsuit"). Thus, Mr. Di Massa wrote to Ms. Clark and Mr. Plummer in April 1998:

> Find copy of Leon A. LaRosa, Jr., CPA, CFE, MST's supplement to his engagement letter of March 5, 1998 copy of which, I understand you already have [sic].

> If acceptable, forward your retainer of $1,500.00 payable to the order of Mr. LaRosa upon receipt of which I shall sign the engagement letter.

Letter from Mr. Di Massa to Ms. Clark and Mr. Plummer, dated April 6, 1998, Exhibit 25 hereto

(emphasis added); *see also* Letters from Mr. Di Massa to Ms. Clark and Mr. Plummer, dated

February 19 and March 13, 1998, similarly included in Exhibit 25 hereto ("At your earliest

convenience, kindly forward your retainer check made payable to Mr. Weir so that the case can

move forward.").

Given that the Massullos' current counsel of record understood Ms. Clark to have the

authority to issue retainer checks on the Massullos' behalf, it is impossible to fathom how he

could sign a pleading which alleges that Ms. Clark lacked both the actual and apparent authority

to do so.

### K.    John Martin III, Esq. ($17,685)

The invoices included in Exhibit 26 hereto, reflect services performed on behalf of the

Massullos in an action brought against them in Pennsylvania state court, captioned *Hamberg,*

*Rubin, Mullin & Maxwell v. Edmund Massullo et al.*, Case No. 94-16032 – the case in which

Mrs. Massullo gave the deposition testimony above (at pp. 7-8). *See* Exhibit 5 hereto (counsel

appearances following the caption page). Although Merrill Lynch has not located every invoice

issued by Mr. Martin's firm, the invoices included in Exhibit 26 include credits for two of the

checks (in the amounts of $4,000 and $6,114, respectively) delivered to that firm by Ms. Clark

and written against Stamford's Merrill Lynch accounts.  *See* Invoices dated September 19, 1995

(at p. 2) and November 14, 1996 (at p. 2), included in Exhibit 26.

### L.    Robert Rotatori, Esq. ($10,000)

Mr. Rotatori represented the Massullos in their initial action against Ms. Clark, Mr.

Plummer, New England Equity and Merrill Lynch, and in the Connecticut Arbitration.  *See*

Transcript of Proceedings in Connecticut Arbitration, Exhibit 27 hereto.  His connection to the

Massullos is irrefutable.

### M.    Phoenix Home Life ($3,500)

As the Bank One Forbearance Agreement recites (*see* Exhibit 13, p. 2), Dr. Massullo held

a life insurance policy that he had pledged as collateral to secure his personal guaranty on the

Mystic Note.  Although Merrill Lynch has not located the specific premium invoice relating to

the check made payable to Phoenix Home Life and drawn against Stamford's account, it located

other invoices evidencing Dr. Massullo's policy and obligation to pay premiums, copies of which

are included in Exhibit 28 hereto.

### N.    Metropolitan Savings ($94,800)

There is similarly a clear link between the Massullo family and Metropolitan Savings,

although the full nature of the relationship is unclear to Merrill Lynch at this time.  What *is* clear

is that Mrs. Massullo had expressly instructed the bank that Ms. Clark had the authority to act on

her behalf.  *See* Letter from Metropolitan Savings Bank to Maureen Clark, dated April 20, 1995

("This letter is being directed to you at the request of Anne Marie Massullo . . . . I have been told

by Anne Marie Massullo that she has authorized your office to forward the requested material."),

included in Exhibit 7 hereto; *see also* Statement of Account attached as Exhibit 29 hereto.

**O.    Montgomery County Sheriff ($66,318.18 and $19.75)**

The Massullos were ultimately unsuccessful in defending against the Lupin Lawsuit (in

which Mr. DiMassa had briefly represented them, as discussed in Point III(J), above).  On May

30, 1995, the court entered judgment against each of them in the amount of $66,383.18, *see*

Exhibit 30 hereto, and the Massullos were required to deposit that amount with the Montgomery

County Sheriff to obtain a stay of execution pending appeal.  Hence, Ms. Clark wrote check no.

128 in the amount of $66,318.18 to the Sheriff's Office on or about June 21, 1996.  A few days

later, she wrote a second check, in the amount of $19.75, to cover interest on the judgment.

For the Massullos to claim that these payments were made for the benefit of Mr. Adams

and/or Ms. Clark is facially absurd.  *See* Letter from Mr. Di Massa, Jr., to Michael Goldberg,

dated November 26, 1997, Exhibit 17 hereto ("I represent the Massullos in connection with a

judgment entered against them in favor of Hamburg, Rubin, Mullin, Maxwell & Lupin in the

amount of $66,383.18 . . . .  In order to perfect our appeal and free up all assets owned by the

Massullos . . . we were required to – and did – post cash security . . . .").

**P.    Mystic Investment ($55,100)**

In light of the fact that the Massullo family owned Mystic Investment (*see, e.g.,*

shareholder signatories to the Forbearance Agreement, Exhibit 13 hereto), and were personally

liable for its debts, any disbursements from Stamford's Merrill Lynch accounts to Mystic were by

definition for the benefit of the Massullos.

**Q.    New England Equity ($574,342)**

The Massullos' obligation to pay New England Equity for its services is plain from the

terms of those parties' agreements.  *See, e.g.,* Agreement, dated October 18, 1993, Exhibit 3

hereto.  Moreover, as discussed in Merrill Lynch's Statement of Answer in this proceeding, New

England Equity, Ms. Clark and Mr. Plummer sued the Massullos before the American Arbitration Association in February 2000 to recover *additional* fees owed to them by the Massullos (the "Connecticut Arbitration"). The Massullos filed counterclaims in that arbitration alleging breach of contract, fraud, conversion, breach of fiduciary duty, and negligence based on essentially the same factual allegations asserted here. Those counterclaims proceeded to arbitration as well.

On April 5, 2000, the parties to the Connecticut Arbitration entered into a settlement agreement resolving all of the claims and counterclaims asserted therein. Pursuant to the terms of the settlement, *the Massullos were required to pay $175,000 to New England Equity*, thereby acknowledging that the payments made through July 1998, including all payments made from Stamford's accounts, were *less* than the total amount owed by the Massullos to Ms. Clark, Mr. Plummer and New England Equity.

Against this background, there is no rational theory under which New England Equity was not entitled to the payments it received from Stamford's accounts. In reality, it was entitled to (and now has a judgment for) more.

**R.    Repairs ($26,319, including $17,689 to Vitello Custom Home)**

Although Merrill Lynch has not yet located every invoice corresponding to Stamford's checks for repair costs, it has identified Vitello Custom Home invoices to Mrs. Massullo totaling $17,689 for work performed at one of her properties. *See* Exhibit 31 hereto. Not coincidentally, the two check payments made from Stamford's account to Vitello Custom Home total $17,689.

**S.    Property Taxes ($124,038.40)**

New England Equity's files included a group of property tax invoices for the Mystic Property in Groton, Connecticut, which together total the $86,223.19 payment made from

Stamford's Merrill Lynch account by check no. 125, which cleared the account on June 24, 1996. *See* Invoices and adding machine tape totaling invoice amounts, Exhibit 32 hereto. These documents demonstrate beyond doubt that Stamford's payments to the Town of Groton Tax Division were for the direct benefit of the Massullos. In particular, it was a condition to Bank One's Forbearance Agreement that "Dr. and Mrs. Massullo shall provide evidence satisfactory to Bank One that all delinquent real estate taxes on the Groton and East Liverpool Properties have been paid in full. During the Forbearance Period . . . Mystic, Dr. and Mrs. Massullo must pay all current taxes when due." Forbearance Agreement, Exhibit 13 hereto, p. 4, ¶ 6.

**T.    Sewer Taxes ($203.50)**

Exhibit 33 hereto establishes that the check payment of $203.50 from Stamford's account for "Tax – Sewer" relates to the Massullos' Mystic property.

**U.    The Massullos ($279,200)**

Although the Massullos' accounting understates the amount paid to them from Stamford's accounts, the amount they admit to having received *alone* demonstrates the frivolous and bad faith nature of their claims. The checks written to the Massullos would have looked like other checks written against Stamford's accounts, meaning that they would clearly have reflected the fact that they were written against Stamford's account and would have been signed by Ms. Clark. *See, e.g.,* Stamford Check written against the Short Term Account, dated June 17, 1996, Exhibit 34 hereto. If the Massullos had not in fact given Ms. Clark check-signing authority for Stamford's accounts, her signature on the checks delivered to the Massullos would have been inexplicable. One would reasonably have expected the Massullos to notify Merrill Lynch immediately that Ms. Clark was writing checks against Merrill Lynch's accounts without the

authority to do so. That the Massullos instead accepted and deposited the checks reflects that Ms. Clark did, in fact, have check signing authority.

*    *    *

The evidence attached hereto supports only one conclusion – that the Massullos were aware that payments were being made from Stamford's account for services rendered *on their* *behalf*. Moreover, Merrill Lynch never had *any* reason to question the legitimacy of any of these transfers. Under these circumstances, Stamford's claims against Merrill Lynch are frivolous and vexatious and should be dismissed.

As Judge Droney held based on only a fraction of the evidence presented here, even with all reasonable inferences drawn in Stamford's favor, the relevant facts do not support its claim that Ms. Clark was unauthorized to act on its behalf with respect to its Merrill Lynch accounts. To the contrary, the relevant facts require the conclusion that Ms. Clark had both the actual and, at a minimum, the apparent authority to make all decisions concerning that account. As a result, the fact that Merrill Lynch and one of its Financial Advisors handled Stamford's account in accordance with Ms. Clark's instructions cannot give rise to any claim of liability on the part of Merrill Lynch.

Stamford's account was well-diversified and profitable. There is not a shred of evidence that has been offered by Stamford to support its claim that Mr. Adams converted the money at issue for his own use (or conspired with Ms. Clark to permit her to convert the money to her use). The reason, of course, is that no such evidence exists.

## CONCLUSION

For all of the foregoing reasons herein, the claims against Merrill Lynch are entirely without merit and should be dismissed with prejudice.

MERRILL LYNCH, PIERCE,
FENNER & SMITH INC.,

By its attorneys,

Mary Gail Gearns
Lauren C. Gould
BINGHAM McCUTCHEN, LLP
399 Park Avenue
New York, New York 10022
(212) 705-7000

Dated: July 1, 2005